IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| LAURA SEIDL | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 10-4152-CV-W-SOW |
| | ) | |
| AMERICAN CENTURY COMPANIES, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER**

Before the Court are the Institutional Defendants' Amended Motion to Dismiss Plaintiff's First Amended Verified Derivative Complaint (Doc. #42) and defendants Thomas A. Brown, Andrea C. Hall, Donald H. Pratt, Gale E. Sayers, M. Jeannie Strandford, and Timothy S. Webster and nominal defendant American Century Mutual Funds, Inc.'s Amended Motion to Dismiss Plaintiff's First Amended Verified Derivative Complaint (Doc. #43). For the following reasons, the motions are denied.

This lawsuit is one of many lawsuits concerning a mutual fund's liability to its shareholders for investments in an illegal off-shore internet gambling business, PartyGaming PLC ("PartyGaming"). After law enforcement instituted a crackdown on PartyGaming's illegal United States operations, the investments declined in value. Plaintiff, Laura Seidl, is a shareholder in the mutual fund, and she has brought this derivative action against the defendants alleging violations of 18 U.S.C. §§ 1961-65 and 18 U.S.C. § 1955, as well as common law claims for breach of fiduciary duty, negligence, and waste. Defendants now move the Court to dismiss plaintiff's Verified Complaint pursuant to Fed. R. Civ. P. 12(b)(6).

I. Background[1]

Plaintiff is an investor in nominal defendant American Century Mutual Funds ("ACMF"), through its American Century Ultra Fund ("the Fund"). ACMF is a "series" mutual fund offering eighteen different series, or classes of stocks to investors. Each series of stock represents a different group of shareholders with an interest in a separate portfolio of securities, referred to as a "fund." The Fund is one of the eighteen funds managed by ACMF, none of which is a separate legal entity. ACMF has a single board of directors, which manages all eighteen of its funds. The Fund does not have a board of directors separate from the board of ACMF.

American Century Companies ("ACC") is an investment management company that controls ACMF and the Fund through its subsidiary, American Century Investment Management, Inc. ("ACIM"). ACC also controls ACMF through its selection and appointment of the executives and the entire board of directors of ACMF, including the individual defendants named in this case.[2] In addition to ACC, ACIM, ACMF, and the members of the ACMF board, plaintiff names additional officers of ACMF[3], and the co-portfolio managers of the Fund.[4]

---

[1] The following facts are alleged in plaintiff's First Amended Verified Derivative Complaint and taken in the light most favorable to plaintiff.

[2] Plaintiff's First Amended Verified Derivative Complaint names the following individuals as ACMF's Board: James E. Stowers, Jr., Chairman of ACMF; Jonathan S. Thomas, Executive Vice President of ACMF from November 2005 through February 2007, and President and CEO of ACMF since January 2007; James E. Stowers, III; Thomas A. Brown; Andrea C. Hall; Donald H. Pratt; Gale E. Sayers; Jeannine Strandjord; and Timothy S. Webster.

[3] These defendants include, William M. Lyons, the President and CEO of ACMF from September 2000 through January 2007, and Mark Mallon, the Executive Vice President and CIO of ACMF.

[4] The co-portfolio managers are Wade Slome, Bruce Wimberly, and Jerry Sullivan.

Plaintiff contends that defendants caused ACMF to repeatedly violate Section 1955[5], by investing and purchasing shares in PartyGaming, an illegal gambling business. Beginning in July 2005, plaintiff alleges that defendants caused, through the Fund, to purchase millions of shares of PartyGaming. In September 2005, ACMF reported that as of July 2005 it owned, through the Fund, 23,771,000 shares of PartyGaming, valued at $72,250,000. Between November 2005 and January 2006, ACMF purchased additional shares of PartyGaming. Plaintiff alleges that each defendant was aware that investing in PartyGaming was risky because defendants were aware that PartyGaming was taking bets from gamblers in the United States and that law enforcement considered PartyGaming's activities illegal.

A similar business to PartyGaming, London-based BetOnSports Plc, was indicted by a United States grand jury in June 2006 for racketeering, mail fraud, and running an illegal gambling enterprise because it was accepting wagers from United States bettors in violation of United States law. Because the indictment was filed under seal, investors did not learn about it until July 16, 2006, when the CEO of BetOnSports was arrested in the United States and the indictment was unsealed. This precipitated share prices to fall drastically, and plaintiff alleges that ACMF sold all of its shares of PartyGaming, resulting in a 16 million dollar loss for the Fund.

On June 28, 2010, plaintiff sent a demand letter to ACMF's board of directors, demanding

---

[5] Section 1955 provides, "Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined under this title or imprisoned not more than five years, or both. 18 U.S.C. § 1955(a). Further, an "illegal gambling business" is a gambling business which–"(i) is a violation of the law of a State or political subdivision in which it is conducted; (ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and (iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has gross revenue of $2,000 in any single day." Id. § 1955(b).

that ACMF pursue the claims asserted in her Southern District of New York Amended Complaint.[6] The board of directors, responding to plaintiff's demand, appointed a Special Litigation Committee ("SLC") to review plaintiff's claims. The SLC was comprised of James Olson and John Whitten, both of whom were not directors at the time of purchases or selling of PartyGaming shares. In addition to these individuals, the SLC hired Gibson, Dunn & Crutcher LLP as counsel to assist in its investigation.

The SLC investigated plaintiff's complaints and considered whether ACMF should pursue such claims. In this investigation, the SLC considered many documents, including minutes and meeting materials for meetings of the Board; the Fund Performance Review Committee; and the Compliance and Shareholder Communications Committee; presentations and reports prepared by the investment advisor; investment policy statements; internal and third-party stock analysis; and correspondence. Moreover, the SLC and its counsel conducted nearly 30 interviews with individuals, either by phone or in person. Plaintiff alleges that the SLC and its counsel did not allow plaintiff to participate in the investigation, nor did it allow plaintiff to review documents or evidence it reviewed or generated. Further, the SLC did not discuss its conclusions with plaintiff prior to issuing its Report. Ultimately, the SLC concluded that it would not be in the best interest of ACMF and its shareholders to pursue the plaintiff's claims. On January 31, 2011, ACMF's current directors adopted a resolution accepting the SLC Report and its recommendations.

---

[6] Plaintiff filed a Complaint in the Southern District of New York, asserting claims on behalf of ACMF and direct claims on behalf of herself and a putative class of Fund shareholders to recover investment losses. Plaintiff filed an Amended Complaint, alleging derivative, class and individual claims for violations of RICO and various common law claims. The District Court dismissed plaintiff's RICO claims, and also held that plaintiff's direct claims could only be brought derivatively and dismissed the Second Amended Complaint for failure to plead demand futility. Seidl v. Am. Century Cos., Inc., 713 F. Supp. 2d 249 (S.D.N.Y. 2010).

II. Standard

A complaint will be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief may be granted if it fails to plead sufficient facts, accepted as true, "to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation omitted). "The plausibility standard is not akin to a 'probability requirement,' but it *asks for more than a sheer possibility* that a defendant has acted unlawfully." Id. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief." Id. (quotations and citation omitted).

Rule 8(a) of the Federal Rules of Civil Procedure requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of this rule is to give defendants "fair notice of what the plaintiff's claim is and the grounds upon which it rests." Swierkiewicz v. Sorema N. A., 534 U.S. 506, 512 (2002) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). The pleading standard announced in Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Iqbal, 556 U.S. at 678 (citation omitted). A complaint will not survive if it offers only "labels and conclusions[,] a formulaic recitation of the elements of a cause of action[, or] naked assertions devoid of further factual enhancement." Id. (quotations and citations omitted).

When ruling on a motion to dismiss, the Court "must accept as true all of the complaint's factual allegations and view them in the light most favorable to the [nonmoving party]," and must

also "draw all reasonable inferences in favor of the nonmoving party." Stodghill v. Wellston Sch. Dist., 512 F.3d 472, 476 (8th Cir. 2008); Coons v. Mineta, 410 F.3d 1036, 1039 (8th Cir. 2005). But the Court need not "accept as true a legal conclusion couched as a factual allegation." Iqbal, 556 U.S. at 678 (citation omitted).

III. Discussion

**A. Collateral Estoppel**

Defendants first argue that plaintiff's First Amended Complaint should be dismissed because the SLC was independent, acted in good faith, and conducted a reasonable investigation. As a threshold matter, defendants argue that plaintiff is precluded from re-litigating the issue of independence of any of ACMF's directors, including the SLC members, by the doctrine of collateral estoppel. Defendants maintain that, in the action filed in New York, plaintiff argued the majority of ACMF's directors could not be expected to respond to a demand in good faith and within the ambit of the business judgment rule.

The Eighth Circuit has stated that collateral estoppel is appropriate when four factors are met:

> (1) the issue sought to be precluded is identical to the issue previously decided; (2) the prior action resulted in a final adjudication on the merits; (3) the party sought to be estopped was either a party or in privity with a party to the prior action; and (4) the party sought to be estopped was given a full and fair opportunity to be heard on the issue in the prior action.

Rippplin Shoals Land Co. v. U.S. Army Corps of Eng'rs, 440 F.3d 1038, 1044 (8th Cir. 2006) (citing Wellons, Inc. v. T.E. Ibberson Co., 869 F.2d 1166, 1168 (8th Cir. 1989)). "For collateral estoppel to preclude an issue, the issue must be identical to the issue previously decided." Irving v. Dormire, 586 F.3d 645, 648 (8th Cir. 2009). Because the parties only dispute whether the issue sought to be

-6-

Case 4:10-cv-04152-SOW Document 59 Filed 10/31/12 Page 6 of 13

precluded here was identical to the issue decided by Judge Cote in Seidl, the Court only addresses the first factor.

The previous issue defendants allude to in Seidl concerned whether the plaintiff had pled sufficient facts to satisfy the standards for pleading *demand futility* under Maryland law. Seidl, 713 F. Supp. 2d at 258-59 ("[Plaintiff contends, however, that a demand would be futile in this case under both prongs of the Werbowsky test."). Indeed, in Seidl the court dismissed plaintiff's Complaint because plaintiff failed to allege sufficient facts that would sufficiently demonstrate that a pre-suit demand would have been futile.

In Werbowsky v. Collumb, 766 A.2d 123 (Md. 2001), the Maryland Court of Appeals performed an exhaustive review of the demand futility requirements. The court held that a shareholder must "first make a good faith effort to have the corporation act directly and explain to the court why such an effort either was not made or did not succeed." Id. at 133. However, the court did recognize a very limited exception to demand futility. The court held that a demand is futile "only when the allegations or evidence clearly demonstrate in a very particular manner," that:

> (1) a demand, or a delay in awaiting a response to a demand, would cause irreparable harm to the corporation, or
> (2) a majority of the directors are so personally and directly conflicted or committed to the decision in dispute that they cannot reasonably be expected to respond to a demand in good faith and within the ambit of the business judgment rule.

Id. at 144.

In Siedl, the plaintiff argued that both of these prongs had been met, and therefore, her demand would have been futile. The Seidl court explained that plaintiff had failed on both of the prongs mentioned above, and further, articulated reasons why plaintiff had failed to demonstrate why the majority of ACMF's directors were "so personally conflicted that they could not respond

to a demand in good faith and within the ambit of the business judgment rule." Seidl, 713 F. Supp. 2d at 260. Defendants contend that because the Seidl court already determined that the directors could independently and in good faith consider claims asserted in the plaintiff's Second Amended Complaint, that collateral estoppel bars plaintiff's claims in this case.

Defendants' argument is misplaced. In Boland, the Maryland Court of Appeals throughly discussed the judicial review that is necessary for a demand *refusal* case. In doing so, the court noted that other than bringing a demand refusal action, a derivative plaintiff may escape dismissal by the board by bringing a "demand excused," i.e. demand futility case. Boland, 31 A.3d at 550. As time has progressed, the court noted, courts have generally moved toward a universal demand requirement and reaffirmed–at least for the time being–the futility exception. In expressing its opinion on why it should continue to adhere to using the demand futility exception, the court noted that a "byproduct of the narrowing 'futility' exception is that the procedural distinction between a 'demand excused' and 'demand refused' action may no longer be viable." Id. Importantly, the Boland court then went on to find that "[b]ecause courts have encouraged derivative plaintiffs to file such a [presuit] demand, including in cases where the Board may find it advisable to appoint an SLC, it is clear that the derivative plaintiff may continue to contest the independence of the board members *after filing such a demand, and should not be prejudiced by that choice*." Id. at 550 n. 25 (emphasis added). Thus, Boland specifically contemplated cases that would allow a derivative plaintiff to argue that a pre-suit demand would have been futile, and if unsuccessful, challenge the Board's independence through a demand refusal action. Thus, the Court finds that plaintiff is not collaterally estopped in this case from challenging the Board's independence.

-8-

**B. Did the SLC Act Independently, in Good Faith, and Conduct a Reasonable Investigation?**

The present case is a derivative action.[7] A derivative action, at common law, was tailored to be "a justifiable, but limited intrusion upon the general authority of the directors to manage the business affairs of the corporation." Boland, 31 A.3d at 548 (citing Werbowsky, 766 A.2d at 135). In a derivative action, the claims belong to the corporation, not to the claiming shareholder. "The purpose of the derivative action is to place in the hands of the individual shareholder a means to protect the interests of the corporation from the misfeasance and malfeasance of faithless directors and managers." Id. (citations omitted). Thus, "[d]espite the role given the shareholder, the 'corporation is the real party in interest . . . and the substantive claim belongs to the corporation.'" Id. (citations omitted).

> The business judgment rule is
>
> a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interest of the company. Absent an abuse of discretion, that judgment will be respected by the courts. The burden is on the party challenging the decision to establish facts rebutting the presumption.

Id. (citations omitted). The business judgment standard recognizes that the "conduct of the corporation's affairs are placed in the hands of the board of directors and if the majority of the board properly exercises its business judgment, the directors are not ordinarily liable." Id. (citing Devereux v. Berger, 284 A.2d 605, 612 (Md. 1971)).

> The business judgment rule is not without its limitations. Indeed, the business judgment rule
>
> can be claimed only by 'disinterested directors whose conduct otherwise meets the tests of business judgment.' This means that the directors can neither appear on both sides of a transaction nor expect to derive any personal financial benefit

---

[7] The parties all agree that Maryland law applies in this case.

> from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally. A shareholder may 'show either that the board or committee's investigation or decision was not conducted independently and in good faith, or that it was not within the realm of sound business judgment.' If the shareholder makes this showing, she may avoid the dangerous terrain of the business judgment rule.

Id. at 549 (internal citations omitted).

The Maryland Court of Appeals has recently reaffirmed that "[j]udicial review of a demand refusal is subject to the business judgment rule, and the court considering a demand fused action [should] limit[] its review to whether the board acted independently, in good faith, and within 'the realm of sound business judgment.'" Id. at 549 (citing George Wasserman & Janice Wasserman Goldsten Family LLC v. Kay, 14 A.3d 1193, 1208 (Md. Ct. Spec. App. 2011)). The court further remarked that "[t]he plaintiff can still allege that the board, in fact, did not act independently, or that the board's refusal to bring suit was wrong. If the plaintiff can successfully show that the subject decision was not the product of sound business judgment, the reviewing court may allow the derivative suit to proceed." Id. at 550 (internal citations omitted).

In its thorough opinion addressing demand futility and demand refusal, the Maryland Court of Appeals also described a vehicle known as the special litigation committee, through which corporations may retain a voice in a derivative lawsuit "despite the adverse interest of board members." Id. at 551 (citation omitted). The court described the SLC as "composed of independent, disinterested directors, either inside the corporation or specially appointed from outside the corporation, [] vested with the authority to render a corporate decision." Id. Thus, "[b]y isolating the tainted directors and delegating the corporation's decision-making ability to an independent committee, the directors may be able to insulate themselves from a derivative lawsuit." Id. It has been widely recognized that a SLC may recommend termination of a derivative lawsuit. See, e.g.,

-10-

id.; Werbowsky, 766 A.2d at 144 (commenting that SLCs have become "common practice").

In Boland, the Court of Appeals methodically described the two approaches courts take in addressing how rigorously to review a SLC's recommendation to dismiss a derivative lawsuit. The court described the first approach, the Auerbach[8] approach, which "treats the SLC's decision like other corporate decisions, and engages in limited review under the business judgment rule." Boland, 31 A.3d at 551. Then the court described the second approach, the Zapata[9] approach, which, among other things, allows the court itself to independently scrutinize the SLC's decision to terminate the derivative action. Id. at 552-54. Ultimately, the Boland court adopted the Auerbach approach, proclaiming that Maryland courts are to give the SLC's substantive decisions judicial deference, but only if the SLC was "independent, acted in good faith, and made a reasonable investigation and principled, factually supported conclusions." Id. at 562. The court further emphasized that directors are not entitled to a presumption regarding these requirements; instead, the court articulated a standard by which the directors could obtain summary judgment. In order to find summary judgment appropriate, the court found that the directors must "state how they chose the SLC member and come forward with some evidence that the SLC conducted a reasonable inquiry upon which its conclusion is based and that no significant business or personal relationships impugned the SLC's independence and good-faith, factual basis." Id.

Boland makes clear that a derivative proceeding may only succeed past summary judgment if the directors "come forward with some evidence that the SLC followed reasonable procedures and that no substantial business or personal relationships impugned the SLC's independence and good

---

[8] Auerbach v. Bennett, 393 N.E.2d 994 (1979).

[9] Zapata Corp. v. Maldonado, 430 A.2d 779 (Del. 1980).

-11-

faith." Id. at 556. And once the directors meet this minimal burden, the burden will then shift to the plaintiffs to come forward with evidence regarding these issues that would enable them to survive summary judgment. See id.

The parties' briefing would suggest that this matter is before the Court on a motion for summary judgment, but currently the Court is faced with a motion to dismiss. It appears that the parties are assuming the Court will convert the motion to dismiss into summary judgment because the plaintiff's Amended Complaint refers to the SLC report. However, the Court declines to treat this motion as one for summary judgment. First, neither party has asked the Court to treat this motion as such. Second, Federal Rule of Civil Procedure 12(d) requires the Court to give both sides a reasonable opportunity to present *all the material* that is pertinent to the motion. Third, it appears that the Boland approach first requires the defendant to come forth with evidence that establishes the SLC followed reasonable procedures and that no substantial business or personal relationship impugned the independence and good faith of the SLC, which is contradictory to the purpose of Federal Rule of Civil Procedure 12(b). The purpose of Rule 12(b) is to test the sufficiency of the plaintiff's statement of a claim without resolving the substantive merits. See 5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1356 (3ed. 2004) (Rule 12 assesses the legal feasability of the Complaint, but does not weight the evidence that may be offered to support it). Because the Court would need to rely heavily on the SLC report in determining whether to grant the motion to dismiss, the Court finds that it would be improper to make such findings on a motion to dismiss and, thus, the Court will revisit the Boland analysis at summary judgment.[10]

---

[10] The parties will be permitted to conduct limited discovery into whether the SLC was independent, acted in good faith, and followed reasonable procedures. However, plaintiff must first provide the Court with the discovery requests plaintiff believes is necessary to investigate

-12-

Case 4:10-cv-04152-SOW   Document 59   Filed 10/31/12   Page 12 of 13

IV. Conclusion

Accordingly, it is hereby

ORDERED that the Institutional Defendants' Amended Motion to Dismiss Plaintiff's First Amended Verified Derivative Complaint (Doc. #42) is denied. It is further

ORDERED that defendants' Amended Motion to Dismiss Plaintiff's First Amended Verified Derivative Complaint (Doc. #43) is denied.

                                             /s/ Scott O. Wright
                                            SCOTT O. WRIGHT
                                            Senior United States District Judge

DATED: October 31, 2012

---

these matters. If, and only if, the Court determines that such information is relevant and not done as a fishing expedition, the Court will have defendants provide said information. If defendants believe an *in camera* inspection is necessary on certain information, defendants shall inform the Court of such.

-13-