IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| LAURA SEIDL, derivatively on behalf of the nominal defendant with respect to its series mutual fund, the American Century Ultra Fund, <br><br> Plaintiff, <br><br> vs. <br><br> AMERICAN CENTURY COMPANIES, INC., et al., <br><br> Defendants, <br><br> and <br><br> AMERICAN CENTURY MUTUAL FUNDS, INC., d/b/a American Century Ultra Fund, <br><br> Nominal Defendant. | Case No. 10-4152-CV-W-ODS |

REDACTED ORDER AND OPINION (1) GRANTING DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT, (2) DENYING PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT, AND (3) FINDING AS MOOT DEFENDANTS' MOTION TO STRIKE

        Pending are cross-motions for summary judgment.  Defendants' motion (Doc. #
107) is granted and Plaintiff's motion (Doc. # 105) is denied.  Defendants' Motion to
Strike (Doc. # 93) is denied as moot.


                        I.  INTRODUCTION AND BACKGROUND


        This is a derivative action, brought by a shareholder against American Century
Mutual Funds, Inc. ("American Century").  The suit seeks to assert claims on American
Century's behalf against several individuals (including certain members of American
Century's Board of Directors) and entities.  Plaintiff demanded that the Board assert the

claims before filing suit. The demand was ultimately rejected. Plaintiff seeks summary judgment, asserting that she has the right to proceed with the suit on American Century's behalf. American Century seeks summary judgment, asserting the decision not to pursue the claims is entitled to deference under the business judgment rule and that Plaintiff therefore lacks standing to pursue the claims.

## A. Summary Judgment Standard

The parties' arguments justify particular attention to the summary judgment standard at the outset. A moving party is entitled to summary judgment on a claim only if there is a showing that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See generally Williams v. City of St. Louis, 783 F.2d 114, 115 (8th Cir. 1986). "[W]hile the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Wierman v. Casey's Gen. Stores, 638 F.3d 984, 993 (8th Cir. 2011) (quotation omitted). This point is particularly relevant in the present case, as a great many immaterial facts – that is, facts that have no bearing under the governing substantive law – have been presented for the Court's consideration. In large measure, the Court has simply ignored those immaterial facts in order to avoid unduly encumbering this Order and the concomitant risks that the legal discussion will be burdened with unnecessary diversions and non sequiturs.

In applying this standard, the Court must view the evidence in the light most favorable to the non-moving party, giving that party the benefit of all inferences that may be reasonably drawn from the evidence. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588-89 (1986); Tyler v. Harper, 744 F.2d 653, 655 (8th Cir. 1984), cert. denied, 470 U.S. 1057 (1985). However, a party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of the . . . pleadings, but . . . by affidavits or as otherwise provided in [Rule 56], must set forth specific facts

showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  In this regard, the Court has been presented many "facts" that are simply unsupported or for which the proffered support does not square with the allegedly uncontroverted fact.  In some instances, what has been presented as "fact" actually constitutes legal opinion or simple argument over adjectives.  For the reasons previously expressed, the Court will not endeavor to discuss all of these instances in detail.

## B.  Undisputed Material Facts[1]

American Century is a "series" mutual fund that offers a variety of portfolios (or "funds") of securities for investment.  Each fund has different investment objectives, strategies, policies, and risks.  One such fund is the Ultra Fund.  American Century has a single board of directors ("the Board") which oversees all of its funds (including, of course, the Ultra Fund).  American Century Companies, Inc. ("ACC") is a separate corporation from American Century.  ACC's subsidiary, American Century Investment Management ("ACIM"), serves as an investment advisor to American Century and some or all of the mutual funds (including the Ultra Fund).

Plaintiff became a shareholder in the Ultra Fund before 2005.  She brings this suit as a derivative action, seeking to bring a suit on behalf of American Century against ACC, ACIM, and various individuals.  Before detailing the events giving rise to the suit, it is appropriate to identify the individuals Plaintiff seeks to sue on behalf of American Century and their roles at the time periods relevant to this dispute:

- James Stowers, Jr.: Member of the boards for American Century Board, ACC and ACIM in 2005-06.
- James Stowers III: Member of the boards for American Century Board, ACC and ACIM in 2005-06.
- Thomas Brown, Andrea Hall, Donald Pratt, Gale Sayers, M. Jeannine Strandjord, and Timothy Webster: Members of American Century's Board in 2005-06.

---

[1]Despite the cautions expressed in the preceding section, there are a great many facts upon which the parties agree.  The Court will include citations to the Record only where such agreement is lacking.

3

- William Lyons: President and CEO of both ACC and ACIM and President of American Century from in 2005-06.
- Mark Mallon: Executive Vice President and Chief Investment officer for ACIM in 2005-06.
- Bruce Wimberly, Wade Slome, and Jerry Sullivan: Collectively, the portfolio managers for the Ultra Fund. Wimberly was the Senior Portfolio Manager. The trio will be referred to collectively as "the Portfolio Managers." Their actual tenures were as follows:
  - Wimberly: 1996 to 2006. More specifically, he left in American Century on July 1, 2006.
  - Slome: 1998 to 2007
  - Sullivan: 2001 to 2008
- Bill Monroe: An investment analyst whose tenure at American Century is not disclosed but who was undoubtedly involved in the events in question.

Two additional individuals need to be identified. James Olson and John Whitten became members of American Century's board after 2006 and are not defendants in this action. They were appointed to serve as a Special Litigation Committee ("SLC") and tasked with considering Plaintiff's demand that American Century file suit against the defendants.

The suit arises out of an investment made by the Ultra Fund in PartyGaming Plc. PartyGaming is an internet gambling company: it operated websites through which players could participate in and gamble on poker games. It did not accept bets on sporting events. PartyGaming was founded in 1997 and incorporated in Gibraltar in 2004; it went public in June 2005 and began trading on the London Stock Exchange. The prospectus for the initial public offering ("IPO") revealed the risk that state and federal laws in the United States might restrict PartyGaming's ability to offer online gambling to United States citizens; it noted conflicting legal authorities on this point. The issue was significant, as 87% of PartyGaming's revenue in the first quarter of 2005 came from United States customers.

The Ultra Fund did not participate in the IPO. Instead, from July 2005 through January 2006, the Ultra Fund purchased nearly thirty-five million shares in PartyGaming

4

on the open market.  The Portfolio Managers were aware of the risk that PartyGaming's activity could be deemed illegal, but for a variety of reasons determined PartyGaming's activity did not violate any laws.

On June 1, 2006, a federal grand jury indicted[2] BetOnSports Plc, a London-based online gambling business, as well as various individuals, on charges of racketeering, mail fraud, and running an illegal gambling enterprise.  The indictment was not unsealed until July 16, and it generally describes BetOnSports as an online gambling business that accepted wagers on sporting events.  When the indictment was unsealed, the stock price for publicly traded online betting companies – including PartyGaming – dropped significantly.  Thereafter, the Ultra Fund began selling its shares in PartyGaming; it sold the last of its shares by the end of July, incurring a loss of approximately $16 million.

Plaintiff initiated her litigation in this matter in August 2008, when she filed suit in the Northern District of California.  That court requested briefing on the issue of transferring the case, at which time Plaintiff dismissed the suit without prejudice and filed a new suit in the Southern District of New York.  This suit purportedly asserted both (1) derivative claims (both statutory and common law) on behalf of herself and other investors in the Ultra Fund and (2) RICO claims[3] directly against American Century, again on behalf of herself and other investors.  The derivative claims were dismissed without prejudice for lack of standing because Plaintiff had not made a pre-suit demand that the Board file suit and Plaintiff had not demonstrated demand was futile; the direct RICO claims were dismissed because Plaintiff had not adequately pleaded proximate cause.  The dismissals were affirmed on appeal.  <u>Seidl v. American Century Cos.</u>, 713

---

[2]Information about the indictment of BetOnSports is a matter of public record and the Court can take judicial notice of these facts (which are really not disputed by the parties).  The indictment was issued by a grand jury in the Eastern District of Missouri; the case number is 06-CR-00337 (CEJ).  On the day the indictment was unsealed, the government also instituted a civil proceeding against BetOnSports, seeking injunctive relief to prevent the company from engaging in illegal business and to prevent its disposition of the proceeds from its illegal activity.  This case, also filed in the Eastern District of Missouri, is case number 06-CV-1064 (CEJ).

[3]A reference to the Racketeer Influenced and Corrupt Organizations Act.

F. Supp. 2d 249 (S.D.N.Y. 2010), aff'd, 427 Fed Appx. 35 (2d Cir. 2011), cert. denied, 132 S. Ct. 846 (2011).

Plaintiff then initiated the instant lawsuit, filing the Complaint on July 15, 2010. This suit differs from the one Plaintiff filed in New York in several significant respects. First, it does not assert any direct claims; all the claims are derivative claims asserted on behalf of American Century. Second, approximately three weeks before filing suit Plaintiff sent a letter to the Board demanding that it pursue the claims in the Second Amended Complaint in the New York action. Third, despite the demand's reference to the operative pleading from the New York case, the Complaint filed in this case did not include the RICO claims asserted in the New York case.

As noted earlier (and as will be discussed in further detail below), the SLC was formed to consider Plaintiff's demand. The SLC issued its report on January 25, 2011. In August 2011, Plaintiff filed an Amended Complaint that added a new claim for breach of contract that also was not included in the New York case; obviously, this timing precluded the SLC's consideration of the breach of contract claim. For the sake of completeness, the Court sets forth the claims Plaintiff seeks to assert on behalf of American Century, as set forth in the Amended Complaint. The first three claims are asserted against all of the defendants:

Count I        Breach of Fiduciary Duty, by causing the Ultra Fund to invest in an illegal gambling business.

Count II       Negligence, by causing the Ultra Fund to invest in an illegal gambling business.

Count III      Waste, by using the Ultra Fund's assets to invest in an unlawful gambling organization in violation of state and federal criminal laws.

Count IV       Breach of Contract; this claim is brought against ACIM only and alleges ACIM breached the management agreement with American Century by causing the Ultra Fund to illegally purchase shares in PartyGaming.

The SLC was formed to consider the demand Plaintiff made before this suit was filed. The SLC consisted of James Olson and John Whitten; they were members of the

6

Board when the demand was made, but were not members of the Board when the Ultra Fund's investments in PartyGaming were made or sold. They were paid $1,000 per meeting, but their ultimate recommendation did not affect the amount of compensation they received. The SLC enlisted the services of the law firm of Gibson, Dunn & Crutcher LLP ("Gibson Dunn") to conduct an investigation and make a recommendation. The investigation was led by John Sturc. Neither Gibson Dunn nor Sturc had ever represented American Century, ACIM, ACC, or any of the individual defendants before being retained by the SLC. Gibson Dunn was retained at the Ultra Fund's expense; the firm submitted its bills to Olson for payment (because Olson was the SLC's chairperson) and Olson submitted them to ACIM for payment by the Ultra Fund. Olson's Second Declaration, ¶¶ 2-3 & Exh. 5.[4] The Record demonstrates Gibson Dunn generally and Sturc specifically did not represent American Century, the Board, or any of the would-be Defendants: it worked on behalf of the SLC for the purpose of gathering information and advising the SLC as to whether American Century should pursue the legal claims Plaintiff asserted.

Plaintiff attempts to create a factual dispute, contending Gibson Dunn was not independent because it actually represented the Board and its members. Her effort to create a factual dispute on this point is unsuccessful. She contends Defendants made a binding judicial admission in the first version of Defendants' Reply Suggestions in Support of Motion to Affirm Confidentiality (Doc. # 97). On page six of that filing, Defendants stated the attorney client "privilege has not been waived because [Gibson Dunn] represented [American Century] as a corporate entity, which included the SLC and the entire board." After inquiry by Plaintiff, Defendants filed Supplemental Suggestions to Clarify Argument in Support of Motion to Affirm Confidentiality (Doc. # 103). The sole purpose for the Supplemental Suggestions was to clarify/amend the aforementioned statement to state the "privilege has not been waived because the privilege is owned by [American Century] as a corporate entity, which included the SLC

---

[4]Plaintiff's effort to create a factual dispute on this point is unavailing. She cites excerpts from three pages of Olson's deposition. Pages 167 and 168 do not address the issue of Gibson Dunn's payment. On page 287, Olson confirmed AICM physically paid the fees but was not asked to describe the entire process or the source of funds used for payment.

7

and the entire board." Plaintiff urges the Court to ignore the Supplemental Suggestions and treat the original statement as a judicial admission that Gibson Dunn represented American Century and the Board. Alternatively, Plaintiff suggests even the amended statement in the Supplemental Suggestions should be construed as demonstrating Gibson Dunn owed fealty to American Century and the Board, reasoning that if the privilege is owned by American Century then Gibson Dunn cannot be independent. The Court rejects both entreaties. As to the first, "[a] judicial admission must be deliberate, clear, and unambiguous." Choice Escrow & Land Title, LLC v. BancorpoSouth Bank, No. 13-1879, slip op. at 23 (8th Cir. June 11, 2014). Given the context and the nature of the issue, the Court holds the statement from Defendants' Reply Suggestions is not deliberate, clear, or unambiguous. The question being addressed was: in the case of a law firm representing a special litigation committee, who holds the attorney-client privilege? There is case law supporting the conclusion that even though the law firm is acting independently of the corporation and board it is still the corporation and board who hold the privilege. E.g., Picard Chem. Inc. Profit Sharing Plan v. Perrigo Co., 951 F. Supp. 679, 686 (W.D. Mich. 1996). The distinction is prone to confusion if precise language is not used. Defendants may have initially used imprecise language, but they have not made a binding judicial admission.

   This discussion also persuades the Court that Plaintiff's secondary position should be rejected. Essentially, Plaintiff argues that if the law grants American Century the ability to invoke or waive the attorney-client privilege (an issue the Court is not addressing in this Order), then Gibson Dunn was effectively representing American Century and the Board. However, if this argument were true, then all law firms representing all special litigation committees would actually represent the corporation – and thus, no law firm could ever be disinterested. Given the prevalence of special litigation committees, cf. In re General Tire & Rubber Co. Securities Litig., 726 F.2d 1075, 1082-83 (6th Cir. 1984); Boland v. Boland, 31 A.3d 529, 551 (Md. 2011), the Court doubts this is a correct statement of law. In reality, the cases recognize a special litigation committee is performing the corporation's work, and in performing that task the special litigation committee may (and probably should) employ legal services from lawyers who owe no duty to the interested board members. The ultimate question, for

present purposes, remains: did those who were investigated as possible defendants in a suit brought by American Century have the ability to control Gibson Dunn's actions or recommendations? The Record conclusively establishes that the answer to this question is "no."

Olson became a Board member in July 2007, which was after the Ultra Fund bought and sold its shares in PartyGaming and he had no involvement in the decisions to buy or sell the stock. Olson joined the Board after being approached by Donald Pratt. In the mid-1990s, Olson was a partner at Ernst & Young and Donald Pratt was CEO of Butler Manufacturing; although he was not the "engagement partner" for the firm, Olson pursued Butler Manufacturing as a client for Ernst & Young. Olson and Pratt occasionally played golf together (approximately once a month) and had drinks afterward at the country club where they were members. These encounters – which sometimes were planned and sometimes were by chance – ended in approximately 2000, when Pratt moved to Tennessee. Olson Dep. at 39-41, 44, 48; Pratt Dep. at 187-88. Ernst & Young performed some tax or auditing work for Butler Manufacturing, but the company never became an actual client of Ernst & Young's and Olson's compensation was not affected by this relationship between the companies. Olson Dep. at 41; Olson Declaration ¶ 10. As of December 2013 – or, approximately two years after the SLC finished its work – Olson was receiving approximately ■ of his income from American Century. Olson and Pratt belonged to the same church for a "brief period" in the late 1990s. Olson Declaration ¶ 9. Olson also knew of Jeannine Strandjord because she worked at Ernst & Young, but he was not well-acquainted with her. Olson Declaration ¶ 11.

Whitten became a Board member in 2008 at the recommendation of Thomas Brown. Whitten previously served as CFO of Applied Industrial Technologies; in approximately 1998 Applied Industrial Technologies bought a company in which Brown was the majority owner. Whitten and Brown did not share a reporting relationship. Whitten Declaration ¶ 6, Whitten Dep. at 235-36, 239. As of December 2013, Whitten was receiving approximately ■ of his income from American Century.[5]

_____

[5]The Record reflects that at least some of Olson's and Whitten's "non-American Century" income was income from various pensions or retirement accounts. The

The SLC retained Gibson Dunn in October 2010 to assist in investigating and evaluating the matter. The investigation took approximately four months. The investigation included communications with Plaintiff's counsel, but Plaintiff's counsel was not permitted to participate in or assist with the investigation. Some of the concerns considered in deciding not to allow Plaintiff's counsel to participate included concerns over attorney-client privilege, witnesses' willingness to cooperate, the risk of exposing confidential information about the Ultra Fund's operations, and the logistical difficulties in coordinating schedules with a third party. The investigation included interviews of approximately thirty individuals (including the Defendants) and the collection of more than four thousand documents. Whitten also participated in all of the interviews; Olson participated in all but one. Olson and Whitten also reviewed the documents collected by Gibson Dunn. Gibson Dunn communicated with the SLC by telephone approximately once a week and regularly updated the SLC as to the investigation's status.

The SLC issued an 81-page report in January 2011 ("the Report"), concluding that it was not in American Century's or its shareholders' best interests to pursue the claims described in Plaintiff's demand. Among the Report's findings were:

- Many third-party analysts had recommended purchasing PartyGaming stock and explained that the legal concerns were overblown.
- There had been no case in which an owner of a publicly traded online gambling company had been prosecuted for violating 18 U.S.C. § 1955.
- The Wire Act was largely understood as applying to betting on sporting events and not to casino/card games.
- The likelihood of success on the claims was doubtful. There were many reasons for this conclusion; the Court does not recount all of them here because (1) they are numerous and (2) the reasons for this conclusion are not subject to judicial scrutiny at this juncture. Some of the reasons for this conclusion include:

---

Record does not establish whether their tangential business connections to other Board members continues; in other words, it is not clear whether Whitten (or for that matter, Brown) continues any relationship with Applied Industrial Technologies, nor is it clear whether Olson retains any connection to Ernst & Young.

- o The Board members did not have responsibility for reviewing individual investment decisions by the Ultra Fund's managers
- o There was considerable doubt that the investment was illegal
- o Even if the investment was illegal, there was sufficient doubt on this point at the time of the investment that it would be difficult to prove any duties were breached
- The litigation would be costly and might eclipse the recovery.
- American Century might have to indemnify the Board members even if the Board members were liable.

Plaintiff attempts to create a dispute over whether Olson and Whitten "meaningfully participated" in the drafting of the Report. The Court finds the effort unavailing for several reasons. First, the Court is not certain why this fact is of any consequence. It appears Plaintiff's objective is to intimate that Olson and Whitten relied heavily on Gibson Dunn's advice. The fact is of little relevance. Having hired legal counsel with expertise in such matters specifically for the purpose of obtaining their advice, it is hardly surprising that Olson and Whitten acted like any client hiring an attorney and relied heavily on their recommendation. Indeed, one could easily envision a world in which a shareholder complained that the SLC did not strongly consider the advice of counsel. Second, Plaintiff supports her effort by pointing Olson's and Whitten's depositions and highlights their inability to recall various details about underlying documents and the Report's contents. In other words, Plaintiff contends that when deposed nearly three years after the investigation concluded, Olson's and Whitten's inability to recall details about the thousands of documents produced and generated during the four month investigation creates a factual dispute as to whether they really had anything to do with the Report. The Court disagrees, and concludes a factual dispute has not been created.

Plaintiff also contends the Report is wrong and the SLC did not consider non-legal reasons for not pursuing the claims (such as the financial cost and the likelihood of having to indemnify some or all of the Defendants), but Plaintiff's argument takes the deposition testimony out of context. For instance, Olson testified that the SLC had not quantified the amount of the recovery because of its assessment that there was a small

11

likelihood of success. Olson Dep. at 157-58. When asked if the lack of merit was "a big part" or "all of" the reason for not pursuing the suit, Olson testified he did not recall. Olson Dep. at 159-60. Despite Plaintiff's counsel's persistent efforts, Olson never said the lack of merit was the only reason the suit was not pursued, and Olson's lack of memory in December 2013 does not contradict his adopted statement from January 2011 (i.e., the Report). Whitten similarly testified the SLC did not attempt to quantify the recovery; he did not testify that the SLC did not consider the cost of litigation. Whitten Dep. at 379-80.[6]

Approximately one week after the Report was issued (and having arranged for its delivery to the Board), the SLC participated in a conference call involving Gibson Dunn, the Board, and the Board's counsel. Olson and Gibson discussed the SLC's investigation and conclusion that there was minimal evidence the Board members or other defendants had failed in their obligations. They also discussed the legal theories proposed by Plaintiff and the pros and cons of pursuing them, closing with the SLC's recommendation that that the claims not be pursued. The Board then unanimously adopted a resolution accepting the Report and the recommendation contained therein.[7] The resolution and the Report were sent to Plaintiff's counsel.

As stated earlier, Plaintiff filed an Amended Complaint in August 2011, adding a derivative claim against ACIM for breach of contract. Defendants filed a Motion to

---

[6]The Minutes of the January 31, 2011 Board meeting and the resulting resolution lend further support for the proposition that the SLC considered a variety of factors – including the costs and benefits – in concluding that the claims should not be pursued.

[7]Defendants describe this action as being taken by the "then current independent directors" and further explain that "Jonathan Thomas, the only interested director on the Board, recused himself from the meeting and discussion of the SLC's recommendation." Defendants' Suggestions in Support (Doc. # 108) at SMF-14 (¶ 65). The Court does not understand this statement: several of the would-be defendants participated in the meeting and voted on the Resolution (and the Court is not even sure why Jonathan Thomas was "interested" given that he is not a defendant in this matter). At best, the directors were "independent" only with respect to decisions about non-board members, such as the decision whether to pursue claims against Slome, Wimberly, Sullivan or Monroe. In addition, some (but not all) of the directors could be said to be independent with respect to ACIM or ACC. However, the Court does not understand how *all* of the directors could be said to be wholly and completely independent.

Dismiss, which was denied because Defendants' arguments relied on facts outside the pleadings. After discussing the controlling legal issues, the Court[8] advised the parties they would "be permitted to conduct limited discovery into whether the SLC was independent, acted in good faith, and followed reasonable procedures." Order dated October 31, 2012, at 12 n.10.

Plaintiff has strived mightily to suggest the Record conclusively demonstrates (or at least, that there is a factual dispute on this point) that the SLC concluded the Ultra Fund's investment in PartyGaming violated the law. The Record does not support this assertion, and the issue is (to some degree) a red herring.



The Report differed from the Draft Memo; it largely retained the observations about the difficulty in conclusively determining that section 1955 prohibited the Ultra Fund's investment, but did not attempt to resolve the question of the statute's

---

[8]The Honorable Scott O. Wright, to whom this case was assigned at the time.

Case 4:10-cv-04152-ODS   Document 122   Filed 07/02/14   Page 13 of 24

applicability or otherwise intimate that section 1955 had been violated. Instead, the Report focused more specifically on the difficulties involved in pursuing Plaintiff's proposed claims: it assumed for the sake of discussion that the investment violated section 1995 without purporting to resolve the issue and concluded that "[e]ven if [Plaintiff's] formalistic interpretation of Section 1955 were correct, however, [American Century] would not have a meritorious claim." ████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████

In the deposition Plaintiff merely walks Olson and Whitten through her legal analysis and asks them to agree to various legal propositions; then proffers their assent as the witnesses' own beliefs. Setting aside the fact that Olson and Whitten are not legal experts,[9] Plaintiff takes the testimony out of context by presenting it to mean something other than what the witnesses actually believed, said and meant. This is most notable with Whitten's deposition, where he was repeatedly asked whether stock ownership constituted ownership in a corporation. The fact that Whitten agreed with this general proposition did not mean Whitten agreed that Ultra Fund's ownership of PartyGaming stock violated section 1955. Olson was asked whether he agreed with the "conclusion" from some document[10] that the investment "likely constituted a federal

---

[9]Interestingly, Plaintiff herself makes this point to criticize the SLC's members and to suggest they abdicated their role in deference to Gibson Dunn's legal assessment. Plaintiff's Suggestions in Opposition (Doc. # 112) at 2; Plaintiff's Suggestions in Support (Doc. # 106) at 12.

[10]The document being quoted in the question is not identified in the deposition excerpt provided to the Court. However, the Bates Stamp number for the page cited – 177632 – corresponds to the page from the Draft Report containing the quoted text used in the question. Counsel's questions on pages 186-88 and 191-92 of Olson's deposition further substantiate the Court's conclusion that counsel knew the language in question did not appear in the Report. In fact, at one point Plaintiff's counsel was asked whether the quote appeared in the SLC's report, and Plaintiff's counsel provided a non-responsive explanation. Olson's Dep. at 187-88. It thus appears counsel was attempting to mislead Olson by reading from the Draft Memo and representing it to be the final Report. This behavior is unacceptable. See Mo. Rule 4-4.1.

14

crime;" the entirety of his answer (and not the snippet Plaintiff relies on) demonstrates Olson did not remember each and every conclusion he had reached in January 2011 and preferred to rely on the Report, finally saying that if the statement was in the final Report then he agreed with it, Olson Dep. at 166-67 – but then, the final Report does not conclude the investment was illegal. ████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████.[11]

Finally, the issue is of rather doubtful importance under the governing legal principles. The SLC considered a variety of factors in deciding whether to pursue the claims. Nobody suggests they were obligated to file suit simply because they believed the claim was valid. The SLC – like any litigant – could legitimately believe a claim is valid yet decide not to pursue it because of the claim's novelty and difficulty, the cost involved, and all the other factors the SLC actually considered.[12] As the next section of this Order demonstrates, the wisdom of the decision is not the issue before the Court.[13]

---

[11]It is also worth noting that Olson did not see the Draft Memo before his deposition, so it was not possible for him to have adopted its reasoning or conclusions in January 2011.

[12]Plaintiff insinuates the Court is empowered to substitute its judgment about the viability of the claims for the SLC's judgment. While there is some language from Boland that supports the idea, see 31 A.3d at 552, it is not a clear commandment that the Court should independently review the SLC's assessment of the risks and benefits of proceeding. The notion runs counter to both the rest of Boland and the analysis the court actually applied to the facts in that case. Allowing the Court to evaluate a part of the SLC's substantive decision seems contrary to Boland's admonition that the Court not utilize its judgment. Nonetheless, the Court states this: it has reviewed the Report and the entire Record, and agrees that the illegality of the investment was – and currently remains – an open question. The Court also agrees that the SLC considered other relevant factors that should have been considered when deciding whether to pursue any of Plaintiff's proposed claims. Intelligent minds could disagree as to the appropriate course of action, and the SLC opted for one of those reasonable decisions. Boland instructs that Courts should not substitute its business judgment for the judgment of a properly constituted and operating SLC.

[13]For these reasons, the Court sees no need to discuss the Board's actions regarding the Draft Memo that took place in February 2014.

## II. DISCUSSION

The parties agree this case is governed by Maryland law, and further agree that Boland v. Boland, 31 A.3d 529 (Md. 2011), represents the latest and most authoritative statement from Maryland's highest court. Generally, a derivative action is a limited and extraordinary intrusion upon the directors' authority to manage the corporation's affairs. Werbowsky v. Collomb, 766 A.2d 123, 135 (Md. 2001). "The derivative suit thus balances the interests of the shareholders with those of the corporation and its directors," and "courts maintain this balance [by applying] varying levels of judicial scrutiny [to] corporate decisions." Generally, deference is given to the directors' business judgment – in fact, this deference is codified in Maryland. See Boland, 31 A.3d at 548 n.24. This deference generally applies when a shareholder demands that the directors file suit on behalf of the corporation, id. at 549, but the justification for the deference diminishes when the decision affects the directors personally; for instance, when a shareholder demands that the corporation sue the directors. A demand for suit is still often required, in which case the board is expected to engage a special litigation committee of disinterested individuals. Id. at 550-51.

The question then becomes: how should a court proceed when the board has engaged a special litigation committee? As Judge Wright's October 2012 Order noted, Boland "methodically described the two approaches courts take in addressing how rigorously to review a SLC's recommendation to dismiss a derivative lawsuit." After comparing the two approaches – New York's approach, typified by Auerbach v. Bennett, 47 N.Y.2d 619, 419 N.Y.S.2d 920, 393 N.E.2d 994 (1979), and Delaware's approach, typified by Zapata Corp. v. Maldonoado, 430 A.2d 779 (Del. 1980) – Maryland opted to follow the Auerbach approach (although the first part of the Zapata approach remains instructive to the extent that it overlaps with Auerbach. Boland, 31 A.3d at 561-62 & n.40; see also 31 A.3d at 556 n.34).[14]

---

[14]Because Boland adopted the Auerbach approach, other cases following that approach are (along with the first part of Zapata) instructive.

16

Boland instructs that the SLC's substantive decisions are presumed reasonable *if* the SLC is independent, acts in good faith, and follows reasonable procedures. However, there is no presumption accorded as to whether the SLC satisfies these prerequisites. 31 A.3d at 556. Thus, summary judgment should not be granted "unless the directors have stated how they chose the SLC members and come forward with some evidence that the SLC followed reasonable procedures and that no substantial business or personal relationships impugned the SLC's independence and good faith." Id. If this is done, "the burden shifts to the derivative plaintiffs to come forward with evidence regarding these issues sufficient to survive summary judgment." Id. For purposes of this inquiry, the merits of the SLC's decision are not considered. Id. at 559. "[T]he SLC's substantive conclusions are entitled to judicial deference, provided that the SLC was independent, acted in good faith, and made a reasonable investigation and principled, factually supported conclusions." Id. at 561. This is important, as Boland is quite insistent that courts not substitute their business judgment for the judgment of a properly-constructed SLC. Indeed, it was this aspect of the Zapata approach that caused Maryland to reject it and instead adopt the Auerbach approach. E.g., id. at 538 ("[W]e shall reject the Petitioner's suggestion that Maryland courts should apply their 'independent business judgment' and review the SLC's substantive conclusions."); id. at 552-53 & n.28. Focusing the inquiry solely on the SLC's independence, good faith and procedures "protects against the danger of judicial overreach and avoids the problem in the second level of the *Zapata* test, which requires the judge to exercise his or her own business judgment." Id. at 561 (quotation omitted).

## A. Independence

"In determining whether the SLC was sufficiently independent from the defendant-directors, the court should first consider any *significant* business relationship or affiliations between the SLC members and the defendant directors." Boland, 31 A.3d at 564 (emphasis supplied). The Court should also consider "evidence of *significant* personal or social relationships" and "the specific circumstances surrounding the

Case 4:10-cv-04152-ODS   Document 122   Filed 07/02/14   Page 17 of 24

selection and delegation of responsibility to the SLC in determining whether it has shown its independence."  Id. at 564, 565 (emphasis supplied).

The SLC was comprised of individuals who were not involved in the decision, were not potential defendants, and were not even on the Board when the underlying transactions occurred.  They retained a law firm for the purpose of investigating the matter and providing counsel; the firm was not beholden to the Defendants.  These facts augur in favor of the SLC's independence.

Plaintiff contends Olson's and Whitten's business and social relationships deprive them of the necessary independence.  The Court disagrees, and holds the undisputed facts about those relationships do not create a factual dispute that requires resolution by a factfinder.[15]  Both Whitten and Olson serve on the Board with the other director-defendants.  Beyond this, there is little of significance to consider – and the Court uses the term "significant" and its variations purposely, because it is the standard set in Boland.  E.g., 31 A.3d at 558 (prior discussion "exemplifies the 'teeth' that the independence inquiry can have when there are significant questions regarding the SLC's relationship with the directors"); at 561 ("the directors must . . . come forward with some evidence . . . that no significant business or personal relationships impugned the SLC's independence . . . ."); at 562 ("the court may examine any significant formal or informal relationship between the parties, including societal or personal influences."); at 564 ("the court should first consider any significant business relationship or affiliations").  The mere existence of business, personal, societal or other relationships is not enough to create a question about the otherwise independent director's independence; those relationships must be significant.  "[T]he independence inquiry does not require the

_____

[15]Some of Defendants' authorities are cases examining "independence" for purposes of evaluating whether a demand should be excused.  It is not clear whether the concept of "independence" in cases examining whether demand will be excused is the same as "independence" when evaluating whether a demand refusal will be upheld.  Given the preference for encouraging demands in all but a very limited number of cases, Boland, 31 A.3d at 550 n.25, it seems quite likely the standards for independence are different.  However, if they are the same, then this further supports Defendants' argument.  E.g., Scalisi v. Grills, 501 F. Supp. 2d 356, 362-63 (E.D.N.Y. 2007) (citing, in part, Werbowsky).  In an abundance of caution, the Court will not rely on demand-excused cases discussing independence.

directors to show, beyond all doubt, that no conceivable theory of influence exists between them and the SLC." Boland, 31 A.3d at 565.

Plaintiff emphasizes Whitten's prior connection to Thomas Brown and Olson's prior connection to Donald Pratt. These connections are not significant. Whitten and Brown crossed paths more than ten years in the past, and then only briefly. Olson and Pratt played golf occasionally more than ten years in the past, during which time they belonged to the same country club. These contacts are hardly worthy of being described as "relationships," and even if they are they are not sufficiently significant to matter. Whitten's tangential connection is meaningless, and both Olson's and Whitten's connections were too distant to be meaningful. "[A] mere acquaintance of a party would not be disqualified from serving on a special litigation committee, and prior service on another board or commission would not show *per se* bias." Id. at 565 n.44. This rationale applies to the present case.

Plaintiff also emphasizes that in their capacity as Board members, Olson and Whitten owe fiduciary duties to all of the shareholders of all of the funds. While this fact is true, Plaintiff has not explained how this relationship could have any effect on Olson's and Whitten's independence. It may be that Plaintiff contends these duties to the other funds interfered with the SLC's ability to consider suing ACIM for fear of impairing the interests of the other funds. This is rather far-fetched and insignificant: crediting this argument would mean no director could make any decision that might affect some but not all of the funds

Finally, Plaintiff points to the fact that Olson and Whitten currently serve on the Board with the director defendants and ███████████████████████████ ███████████. These considerations rarely rise to the level of significance. "The majority view recognizes that independent directors are capable of rendering an unbiased decision even though they were appointed by the defendant directors and share a common experience with defendants." Lerner v. Prince, 2014 WL 2118253 (N.Y. App. Div. May 22, 2014) (quotations omitted); see also Boland, 31 A.3d at 565 n.44; Scalisi v. Grills, 501 F. Supp. 2d 356, 362-63 (E.D.N.Y. 2007) (citing cases applying Auerbach, Zapata, and Maryland law); Genzer v. Cunningham, 498 F. Supp. 682, 694 (D. Mich. 1980) (applying Auerbach); Sutherland v. Sutherland, 958 A.2d 235,

241 (Del. Ch. 2008) (applying first prong of <u>Zapata</u> and quoting <u>In re Oracle Securities</u> <u>Litig.</u>, 852 F. Supp. 1437, 1442 (N.D. Cal. 1994)).  There is no requirement that the Board abdicate the decision to a committee comprised of individuals wholly disconnected to the company.  Indeed, delegating complete decisionmaking authority to such individuals might itself be a dereliction of duty, so this step is not required. <u>Auerbach</u>, 393 N.E.2d at 1002.

Ultimately, there is no evidence that the director defendants "so controlled and dominated the investigative process as to render [the SLC] mere puppets."  <u>Lichtenberg</u> <u>v. Zinn</u>, 260 A.D.2d 741, 743, 687 N.Y.S.2d 817, 820 (1999) (applying <u>Auerbach</u>). There is also no evidence suggesting any significant business or personal relationships impugning the SLC's independence.  <u>Boland</u>, 31 A.3d at 556, 561.

## B.   Reasonable Methodology

"The reviewing court must examine the methodologies and procedures of the SLC's investigation, and whether there was a reasonable basis for its conclusions." <u>Boland</u>, 31 A.3d at 566.  The ultimate conclusion is not to be evaluated to determine the methodology's reasonableness,[16] but the Report can be examined as it may self-describe procedural irregularities that demonstrate unreasonableness.  <u>Id</u>.  For instance, "[t]he SLC cannot arrive at a reasonable answer if addresses the wrong issues.  Thus, addressing the wrong issues is an example of unreasonable methodology."  <u>Id</u>.  Other factors to consider include whether (1) independent counsel was engaged to assist in the investigation, (2) the SLC reviewed the testimony and statements of those involved in the matter, and (3) relevant documents were reviewed. <u>Scalisi</u>, 501 F. Supp. 2d at 363.

Having reviewed the uncontradicted material facts, the Court concludes there is no question that the SLC adopted a reasonable methodology.  It retained disinterested counsel to investigate the matter and provide legal advice.  SLC members reviewed the

---

[16]"Moreover, the mere length of the report and the sheer volume of items considered should not be given undue weight by the court."  <u>Boland</u>, 31 A.3d at 566.

evidence gathered, including documents, statements and testimony. The Report itself reveals nothing that would cause concern.

Most of Plaintiff's arguments[17] on this point contend that the methodology was flawed because insufficient attention was paid to various pieces of evidence or information. The argument essentially is: the conclusion derived from the process is flawed because it was wrong, therefore the methodology was flawed. The Court will not marshal these arguments because they are not material under the relevant legal standard. As noted earlier, Boland clearly holds that under Maryland law the SLC's conclusion cannot be used to attack the methodology that produced the conclusion. E.g., Boland, 31 A.3d at 560-61 & n.39. This was the whole point of Boland's rejection of the Zapata approach and its adoption of Auerbach. E.g., id. at 553-55.

Plaintiff also suggests that the ultimate decision as to whether to sue rested with the Board as a whole and not the SLC. While there is a basis to be concerned on this regard, see footnote 7, supra, the Court is not persuaded the issue is sufficient to justify denying summary judgment. First, several of Plaintiff's proposed defendants were not members of the Board. Some of the non-director defendants were individuals, and some were entities to which at least some Board members had no connection; there is no reason why the Board members could not decide whether or not to sue those individuals and entities. Second, even if the Board should not have been involved in the process at all, the outcome would have been the same. The SLC's recommendation was that American Century not pursue the claims: if the SLC had the ultimate power to make the final decision, then the decision would have undoubtedly mirrored its recommendation.

Finally, Plaintiff has challenged the SLC's investigation because nobody "represented" Plaintiff's side. While the observation is correct, it is immaterial. There is no case law suggesting the Plaintiff must be allowed to participate in the investigation.

---

[17]Plaintiff suggests the SLC did not examine the correct legal issues. However, the substance of her argument is that the SLC placed greater weight on certain factors and analyzed the issues differently than she would have. This is a challenge to the substance of the decision, not the methodology. Additionally, much of this argument depends on matters (e.g., the assertions that the SLC definitively determined the law had been violated and that the SLC did not consider any factors other than the legality of the investment) that have been found unavailing.

As a neutral investigator for and advisor to the SLC, it is fair to presume that Gibson Dunn considered Plaintiff's position and views (and the Report confirms this). The SLC is to conduct an evaluation, and the evaluation may be from an objective/neutral position; the law does not require the SLC to mirror the adversarial process by soliciting input from an ardent believer in Plaintiff's position.

### C.  Good Faith

Boland also intimates there is a "good faith" component, but does not define it separately. Most often, it is mentioned in the same breath as the requirement that the SLC be independent. However, Plaintiff has presented another argument that seems distinct from the inquiries into independence and methodology. Plaintiff invites the Court to consider the Board's actions in April 2013 with respect to a demand delivered by a different litigant (Nelson Gomes). After Gomes – represented by the same attorneys as Plaintiff – delivered his demand, he allegedly asked the Board to agree to toll the statute of limitations so the claim would not expire while the Board considered his demand. The Board allegedly declined. The Court declines to consider this event for several reasons. First, the Court is not inclined to allow or require litigation of issues related to the Gomes case in this proceeding. Second, even if the events occurred as Plaintiff has described they occurred more than two years after the demand in this case was refused.

The Court is presently considering the independence and good faith of the SLC. The Court does not know the SLC's role with respect to the Gomes matter. It may be that a completely different committee made the decision. It may also be that the decision regarding Gomes' demand was made with the knowledge that this matter had already been fully considered by the SLC that considered Plaintiff's claims. The facts described do not provide sufficient basis for deriving anything meaningful regarding *this* case, and the Court is not inclined to collapse the separate lawsuits into one. For these reasons, the Court does not believe that events occurring after the decision are material to ascertaining the good faith of the SLC at issue in this case.

Plaintiff also contends the SLC "played softball" with various witnesses by not inquiring into various matters. There is no need to recount all of these matters; it is enough to state Plaintiff's arguments rely in misstatements or distortions of the Record. For instance, Plaintiff offers pages 299 to 300 of Olson's deposition as support for the proposition that Olson "failed to challenge" Monroe concerning an e-mail he sent – but while the e-mail is addressed on those pages there is no intimation that Olson failed to ask Monroe questions about it. Elsewhere, Olson is represented as "conced[ing] that witnesses were never asked important questions . . . because Plaintiff's counsel was intentionally excluded from the investigation, and nobody else had . . . the motivation or the knowledge to ask penetrating questions." Plaintiff's Suggestions in Opposition (Doc. # 112) at A03. Again, nothing in Olson's deposition supports this asserted fact.

## D. Count IV

Separate and apart from the above discussion, an additional issue arises with respect to Count IV. Plaintiff did not demand that the Board consider filing suit against ACIM for breach of contract. The demand referenced the claims asserted in the Second Amended Complaint Plaintiff filed in the New York case, but the breach of contract claim asserted in Count IV was not asserted in the New York case. It was not added as a claim in this case until after the SLC completed its investigation and rendered a decision. Plaintiff is collaterally estopped (or barred by res judicata) from contending a demand was futile, and in the absence of a pre-suit demand she cannot proceed on this claim.

Interestingly, Defendants do not raise this issue; in fact, they seem to not be concerned about this failing. Defendants' Suggestions in Support (Doc. # 108) at 14. The Report addresses a potential contract claim against ACIM, but only in passing. For her part, Plaintiff does not contend the SLC failed to fully consider the claim (which is only appropriate, given that she did not demand the Board consider the claim before asserting it in her Amended Complaint).

Even if the argument has been waived (an issue the Court need not reach), the Court holds that summary judgment can be granted with respect to Count IV. The issue

was briefly addressed by the SLC, and the SLC's other conclusions lead the Court to believe the SLC would certainly have declined to assert a breach of contract claim against ACIM for the same reasons it declined to assert the other claims Plaintiff proposed.

## III.  CONCLUSION

The undisputed material facts in the Record demonstrate the SLC was independent, acted in good faith, and utilized reasonable procedures and methodologies to evaluate the claims Plaintiff presented in her demand.  The ultimate decision to not assert those claims is entitled to deference from the Court; the Court's business judgment has no place in the inquiry, and should yield to the SLC's business judgment.  Therefore, Plaintiff's Motion for Summary Judgment is denied and Defendants' Motion for Summary Judgment is granted.  Defendants' Motion to Strike – which seeks to strike Plaintiff's jury demand – is therefore moot.

IT IS SO ORDERED.


/s/ Ortrie D. Smith
ORTRIE D. SMITH, SENIOR JUDGE
DATE: July 2, 2014                                    UNITED STATES DISTRICT COURT